UNITED STATES BANKRUPTCY COURT                    **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CAMOFI MASTER LDC AND CAMHZN          :
MASTER, LDC,                          :
                                      :
                 Plaintiffs,          :        Adv. No. 14-02049 (SHL)
                                      :
        v.                            :
                                      :
U.S. COAL CORP., EAST COAST MINER     :
LLC, JAD COAL COMPANY, INC.           :
                                      :
                 Defendants.          :
                                      :
-------------------------------------------------------------X
U.S. COAL CORP. and JAD COAL COMPANY, :
INC.,                                 :
                                      :
                 Counterclaim Plaintiffs, :
                                      :
        v.                            :
                                      :
CAMOFI MASTER LDC, CAMHZN MASTER,     :
LDC, and CENTRECOURT ASSET            :
MANAGEMENT, LLC,                      :
                                      :
                 Counterclaim Defendants.  :
-------------------------------------------------------------X

## MEMORANDUM OF DECISION

A P P E A R A N C E S :

AKIN GUMP STRAUSS HAUER & FELD LLP
*Counsel for CAMOFI Master LDC, CAMHZN Master LDC, and Centrecourt Asset*
*Management, LLC*
        By:    Douglas A. Rappaport, Esq.
               Robert J. Boller, Esq.
               Rachel E. Albanese, Esq.
               Mili G. Desai, Esq.
               Arik Preis, Esq.
One Bryant Park
New York, NY 10036

LUSKIN, STERN & EISLER LLP
*Counsel for East Coast Miner LLC*
    By:    Michael Luskin, Esq.
           Stephan Hornung, Esq.
           Alex Talesnick, Esq.
Eleven Times Square
New York, NY 10036

NIXON PEABODY LLP
*Counsel for U.S. Coal Corporation and JAD Coal Company, Inc.*
    By:    Dennis Drebsky, Esq.
           Abigail T. Reardon, Esq.
           Frank Penski, Esq.
437 Madison Avenue
New York, NY 10022

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

      Before the Court is a motion by CAMOFI Master LDC, CAMHZN Master LDC, and Centrecourt Asset Management, LLC (the "CAM Entities") to remand claims against East Coast Miner, LLC for tortious interference with contract back to the New York Supreme Court in New York County (the "Motion"). The Motion is opposed by East Coast Miner, LLC ("ECM") and fellow defendants, U.S. Coal Corporation and JAD Coal Company, Inc., both of whom are debtors in a bankruptcy proceeding in Kentucky. For the reasons explained below, the Motion is denied.

## BACKGROUND

      The CAM Entities are two Cayman Island investment funds (the "CAM Funds") and their investment advisor, Centrecourt Asset Management, LLC, which is a Delaware limited liability company.[1] Am. Compl. ¶¶ 10-11; Am. Answer ¶¶ 95, 99. The CAM Funds hold equity and debt in U.S. Coal, a Delaware corporation, and its wholly-owned

---

[1]     All the background is from the allegations in the amended complaint and amended answer of the parties. *See* Am. Compl. (Decl. of Douglas Rappaport, Ex. 1) [ECF No. 5-1]; Am. Answer (Decl. of Abigail Reardon, Ex. D) [ECF No. 15-4].

major-operating subsidiary JAD Coal, a Virginia corporation, who are in the coal

business.  Am. Compl. ¶¶ 1, 16.  ECM, a Delaware limited liability company, is an

investment vehicle that owns debt in U.S. Coal and its subsidiaries that is subordinate to

the debt held by the two CAM Funds.  Am. Compl. ¶¶ 7, 14, 29.  In 2009, directors,

officers, and shareholders of U.S. Coal formed ECM.  Am. Compl. ¶ 27.  ECM was

interested in recapitalizing U.S. Coal by purchasing a significant amount of its debt—at a

discount—and investing in its equity.  Am. Compl. ¶¶ 27, 29.  The CAM Funds

consented to those recapitalization transactions.  Am. Compl. ¶ 29.  After the

recapitalization transactions, all of U.S. Coal's directors were ECM members.  Am.

Compl. ¶ 30.

In 2012, the CAM Funds filed a six-count amended complaint against U.S. Coal,

JAD Coal, and ECM in the New York State Supreme Court in New York County (the

"Amended Complaint").  *See CAMOFI Master LDC v. U.S. Coal Corp*., Index No.

650411/2012 (N.Y. Sup. Ct. N.Y. Cnty. 2012) (the "New York Action") (Decl. of

Rappaport, Ex. 1) [ECF 5-1].  The Amended Complaint concerns three distinct

agreements among the parties: (i) an April 2008 letter agreement where U.S. Coal gave

the CAM Funds certain consent rights; (ii) an agreement giving the CAM Funds the right

to make U.S. Coal repurchase their stock; and (iii) an equipment note given by JAD Coal

to the CAM Funds.  In claims one through three of the Amended Complaint, the CAM

Funds allege that U.S. Coal and JAD Coal breached all three agreements.  Am. Compl. ¶¶

52-69.  In claims four through six, the CAM Funds allege that ECM tortiously interfered

with the three agreements by intentionally causing U.S. Coal or JAD Coal to breach the

three agreements.  Am. Compl. ¶¶ 70-85.

## I.    The April 2008 Letter Agreement

In June 2007, the CAM Funds acquired preferred stock in, and warrants to purchase common stock of, U.S. Coal.  Am. Compl. ¶ 18.  In connection with the acquisition, U.S. Coal agreed that it would obtain written consent from the CAM Funds before (a) borrowing money under certain conditions; (b) hiring or firing officers with an annual salary over $100,000; or (c) entering into affiliate transactions involving over $500,000.  Am. Compl. ¶¶ 19-20.  U.S. Coal reaffirmed its obligations to obtain the CAM Funds' written consent in the April 2008 letter agreement.  Am. Compl. ¶¶ 19-20.

The CAM Funds allege that U.S. Coal breached this agreement by failing to obtain the CAM Funds' written consent for a variety of actions, including: (i) firing U.S. Coal's CEO and hiring a member of ECM; (ii) paying the outgoing CEO $1.2 million in severance; (iii) extending maturity dates on various debt instruments, causing significant additional interest payments; and (iv) issuing a $6,729,423 secured note in October 2014 to a newly formed insider entity called ECM II, which will pay over $3 million in interest through maturity.  Am. Compl. ¶¶ 41-49.

## II.    The Rights Agreement

In April 2008, the CAM Funds received 425,000 shares of U.S. Coal common stock in exchange for purchasing a note from JAD Coal.  Am. Compl. ¶ 21.  The CAM Funds also obtained a conditional put right to require U.S. Coal to repurchase their 425,000 shares at $5.40 per share if U.S. Coal failed to either sell its common stock through an initial public offering or execute certain transactions with a public shell company by April 1, 2010.  Am. Compl. ¶ 22.  U.S. Coal allegedly failed to satisfy either condition and thereby triggered the CAM Funds' conditional put right.  Am. Compl. ¶¶

4

34-35.  The CAM Funds sent a letter to U.S. Coal seeking to exercise their put option and

require U.S. Coal to repurchase the 425,000 shares.  Am. Compl. ¶ 36.  U.S. Coal sent a

letter acknowledging the exercise of the CAM Funds' put right.  Am. Compl. ¶¶ 37-38.

Nevertheless, U.S. Coal allegedly failed to repurchase the 425,000 shares at $5.40 per

share.  Am. Compl. ¶¶ 39-40.

### III.    The JAD Coal Equipment Note

Under an equipment purchase agreement, the CAM Funds transferred their

interest in certain mining equipment to JAD Coal in exchange for purchasing the JAD

Coal equipment note.  Am. Compl. ¶ 24.  The note includes a regular annual interest rate,

a late-payment penalty interest rate, a fee on late payments, and entitles the CAM Funds

to collection costs upon any event of default under the note.  Am. Compl. ¶¶ 25, 26.  The

note matured in April 2012.  Am. Compl. ¶ 33.  JAD Coal allegedly owes the CAM

Funds over $4,200,000 in outstanding principal, interest, and fees, which was repeatedly

demanded by the CAM Funds.  Am. Compl. ¶¶ 33, 62.

### IV.    Other Claims in the New York Action

In addition to their contract claims, the CAM Funds allege that ECM tortiously

interfered with each of the three agreements.  Am. Compl. ¶¶ 74, 79, 84.  More

specifically, the CAM Funds contend that ECM intentionally caused U.S. Coal to breach

the April 2008 letter agreement, Am. Compl. ¶¶ 81-85, and the rights agreement, Am.

Compl. ¶¶ 70-75, and also intentionally caused JAD Coal to default on the equipment

note.  Am. Compl. ¶¶ 76-80.

The New York Action also includes counterclaims by U.S. Coal and JAD Coal

against the CAM Entities.  Am. Answer ¶¶ 133-37.  The current status of all the

counterclaims is unclear, *see* Hr'g Tr. 5:1-6:20, Sept. 18, 2014 [ECF No. 22], but at least

one counterclaim against Centrecourt remains pending.  *Id*.  That counterclaim alleges

that Centrecourt breached an advisory services agreement with U.S. Coal by: (i) failing to

act in the best interest of U.S. Coal; (ii) engaging in self-dealing; and (iii) failing to

provide strategic advisory services in good faith, free of conflicts of interest and with full

disclosure.  Am. Answer ¶¶ 112, 114-37.  In particular, "Centrecourt advised U.S. Coal

and JAD [Coal] to enter into a series of transactions with the [CAM Funds] which were

not fair and reasonable or in the best interests of U.S. Coal or JAD [Coal], and which

actually benefitted Centrecourt . . . " and the CAM Funds that "Centrecourt manages and

controls."  Am. Answer ¶¶ 114, 122.  These transactions include an equipment purchase

agreement, as well as the equipment note, rights agreement, and April 2008 letter

agreement described above.  Am. Answer ¶¶ 115, 119, 123.

## V.    Procedural Posture

After the CAM Funds filed the Amended Complaint in the New York Action,

creditors commenced involuntary bankruptcy cases against U.S. Coal and JAD Coal.

These Chapter 11 cases are now jointly administered in the U.S. Bankruptcy Court for the

Eastern District of Kentucky.  *See In re Licking River Mining*, LLC, Case No. 14-10201

(Bankr. E.D. Ky. 2014) (Decl. of Reardon, Ex. E) [ECF No. 15-5].  U.S. Coal and JAD

Coal removed the New York Action to federal court pursuant to 28 U.S.C. § 1452(a) and

28 U.S.C. § 1334, asserting that all the claims in the New York Action relate to the same

events, should be decided in one forum, and that the outcome of the New York Action

could alter the Debtors' rights and liabilities.  Notice of Removal at 3 (Decl. of Reardon,

Ex. A) [ECF No. 15-1].  The removed matter was then referred to this Court under the

Amended Standing Order of Reference of the United States District Court for the

Southern District of New York, General Order M-431, dated Jan. 31, 2012 (Preska, C.J.).

The CAM Entities have already consented to transfer claims one through three of

the Amended Complaint—alleging breaches of contract against U.S. Coal and JAD

Coal—to the U.S. Bankruptcy Court for the Eastern District of Kentucky, where U.S.

Coal and JAD Coal are proceeding with their Chapter 11 cases.  *See* E-mails between

Robert Boller and Abigail Reardon, dated Aug. 20-21, 2014 (Decl. of Reardon, Ex. B at

1) [ECF No. 15-2].  The Motion seeks to remand claims four through six—alleging

tortious interference against non-debtor ECM—to the New York State Supreme Court in

New York County.  If the Motion is denied, the CAM Entities consent to transfer claims

four through six to the U.S. Bankruptcy Court for the Eastern District of Kentucky, which

would put all of the claims in the Amended Complaint in that forum.  *See id*.  Regardless

of the outcome on the Motion, therefore, claims one through three will be transferred to

the bankruptcy court in Kentucky.  This Motion will decide only the forum for resolving

the remaining tortious interference claims.  *See id*.[2]

---

[2]    The briefs of ECM and U.S. Coal spend considerable time on whether this Court has "related to" jurisdiction over the claims against ECM.  As the CAM Entities have not challenged such jurisdiction, *see* Reply at 1, the Court does not address the issue here, other than to conclude that "related to" jurisdiction exists.  *See, e.g., Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 114 (2d Cir. 1992) (related to jurisdiction exists where outcome of litigation might have any conceivable effect on the bankruptcy estate); *In re Residential Capital, LLC*, 497 B.R. 720, 745-46 (Bankr. S.D.N.Y. 2013) (related to jurisdiction exists where third party non-debtor claims directly affect the *res* of the bankruptcy estate, including where premised on a contractual indemnification obligation by bankrupt entity) (citations omitted); *ML Media Partners, LP v. Century/ML Cable Venture (In re Adelphia Commc'ns. Corp.)*, 285 B.R. 127, 137 n.31 (related to jurisdiction exists where claims by a non-debtor against a non-debtor defendant were "intimately intertwined" with those asserted against the debtor) (citing *Nemsa Establishment, S.A. v. Viral Testing Sys. Corp.*, 1995 WL 489711, at *7 (S.D.N.Y. Dec. 9, 1993)).

## DISCUSSION

### I.    Standard for Equitable Remand

This Court may remand claims removed to it on any equitable ground.

28 U.S.C. § 1452(b).  A court has broad discretion in conducting the equitable remand

analysis.  *See AEG Liquidation Trust v. Toobro (In re Am. Equities Grp., Inc.)*, 460 B.R.

123, 128 (Bankr. S.D.N.Y. 2013) (citing *In re Micro Design, Inc.*, 120 B.R. 363, 366

(E.D. Pa 1990)).  Seven factors are commonly considered in the equitable remand

analysis:

> (A)    the effect on the efficient administration of the bankruptcy estate;
> (B)    the extent to which issues of state law predominate;
> (C)    the difficulty or unsettled nature of the applicable state law;
> (D)    comity;
> (E)    the degree of relatedness or remoteness of the proceeding to the main
>          bankruptcy case;
> (F)    the existence of the right to a jury trial; and
> (G)    prejudice to the involuntarily removed defendant(s).

*See, e.g., In re Am. Equities*, 460 B.R. at 128 (citing *Drexel Burnham Lambert Grp., Inc.*

*v. Vigilant Ins. Co.*, 130 B.R. 405, 407 (S.D.N.Y. 1991)).  But these factors are "merely

illustrative" and do not constrain a court in its discretionary equitable remand analysis.

*See In re Am. Equities*, 460 B.R. at 123 (citing *JMB Capital Partners, L.P. v. CRT*

*Capital Grp. LLC (In re NTL, Inc.)*, 295 B.R. 706, 719 (Bankr. S.D.N.Y. 2003)).  Two

additional factors often considered include the "duplicative and uneconomical use of

judicial resources" and the "lessened possibility of inconsistent results."  *See Nemsa*,

1995 WL 489711, at *7 (citing *Phoenix Elec. Contracting v. Lovece*, 1993 WL 512917,

at *3 (S.D.N.Y. Dec. 9, 1993)).

While the Second Circuit has not identified which party has the burden as to

remand, the Section 1452(b) equitable remand analysis is essentially the same as the

Section 1334(c)(1) permissive abstention analysis where the movant has the burden.[3] *See Residential Funding Co., LLC v. UBS Real Estate Secs., Inc. (In re Residential Capital, LLC)*, 515 B.R. 52, 67 (Bankr. S.D.N.Y. 2014) ("The movant bears the burden of establishing that permissive abstention is warranted."); *New York City Emps.' Ret. Sys. v. Ebbers (In re Worldcom, Inc. Secs. Litig.)*, 293 B.R. 308, 334 (S.D.N.Y. 2003) ("The equitable remand analysis, as the parties agree, is essentially the same as the Section 1334(c)(1) abstention analysis.") (citing *Nemsa*, 1995 WL 489711, at *9).  Moreover, courts outside the Second Circuit have concluded that a party seeking remand has the burden to establish that equitable remand is warranted.  *See, e.g., H.J. Rowe, Inc. v. Sea Pros., Inc. (In re Talon Holdings, Inc.)*, 221 B.R. 214, 219 (Bankr. N.D. Ill. 1998) (citing *Brizzolara v. Fisher Pen Co. (In re Brizzolara)*, 158 B.R. 761, 769 (Bankr. N.D. Ill. 1993)); *Pettus Props., Inc. v. VFC Partners 8, LLC (In re Pettus Props., Inc.)* 2012 WL 956915, at *4 (Bankr. W.D.N.C. Mar. 20, 2012); *Appatek Indus., Inc. v. BioLab, Inc.*, 2010 WL 731366, at *3 (M.D.N.C. Feb. 25, 2010) (citing *Sowell v. U.S. Bank Trust Nat'l Assoc.*, 317 B.R. 319, 322 (E.D.N.C. 2004)); *Quicken Loans, Inc. v. Walters (In re Walters)*, 2013 WL 5505055, at *6 (S.D.W. Va. Oct. 2, 2013).  Accordingly, this Court will place the burden on the movants to demonstrate that remand is appropriate.

---

[3]        The doctrine of permissive abstention—also called equitable or discretionary abstention—allows the Court to refrain from hearing a particular proceeding in the interests of justice or certain federal-state concerns.  *See* 28 U.S.C. § 1334(c)(1); *see also In re Motors Liquidation Co.*, 522 B.R. 13, 22-28 & nn. 29-31 (Bankr. S.D.N.Y. 2014) (citing cases that "fleshed out" the doctrine and applying factors relevant to the exercise of discretionary abstention).

II.    **The Balance of the Factors Do Not Support Remand**

    (A)    **The Effect on the Efficient Administration of the Bankruptcy
Estate**

As to the first factor regarding the effect on the efficient administration of the

bankruptcy estate, the Court concludes that the Defendants have the better of the

argument.  Litigating pieces of the New York Action in two separate forums undoubtedly

will have a negative impact on the efficient administration of the bankruptcy case.  *See*

*Calpine Corp. v. Nevada Power Co. (In re Calpine Corp.)*, 354 B.R. 45, 50 (Bankr.

S.D.N.Y. 2006) (recognizing the "significant burden and distraction" litigation in a

separate venue can cause to "key employees," taking away from a debtor's "restructuring

efforts.").  The tortious interference claims are inextricably intertwined with the contract

claims already before the bankruptcy court.[4]  Remanding some claims to the New York

State Court and moving others to bankruptcy court in Kentucky will split the attention of

the Debtors and their professionals.  The CAM Funds rely upon their right to seek a jury

trial.  But as the CAM Funds have not yet demanded a jury trial, the likelihood and effect

of a jury demand is speculative at this point in the case.  *See* Hr'g Tr. 13:9-20 (Mr.

Rappaport, counsel for the CAM Entities, stated "[t]hat decision [to seek a jury trial] has

not been made definitively.  I would say that decision, that possibility is certainly on the

table . . . .").  But if such a demand is made, the bankruptcy judge in Kentucky can

address that demand as appropriate.  This might include sending all of the CAM Funds'

claims to the District Court in Kentucky for adjudication, or the claims may all settle as

part of a global resolution between all parties involved.  In any event, all the claims could

---

[4]    In addition to the tortious interference claims, at least one counterclaim also implicates the same
three agreements as the contract claims.  *See* Am. Answer ¶¶ 133-37.

be handled together up until trial.  *See Lehman Bros. Holdings, Inc. v. Hometrust Mortg.
Co.*, 2015 WL 891663, *4-5 (S.D.N.Y. Feb. 25, 2015) (denying permissive withdrawal
involving a non-core claim where it was more efficient to keep all claims before the
bankruptcy court).  The concerns here are for efficiency and coordination, which are far
more important "than concerns as to whether a bankruptcy judge, on the one hand, or a
district judge on the other, handles any ultimate jury trial."  *In re Adelphia Commc'ns.
Corp.*, 285 B.R. at 147; *see Lehman Bros. Holdings, Inc.*, 2015 WL 891663, at *5
(denying permissive withdrawal where, among other things, the need for jury trial was
theoretical).

        This conclusion is also supported by the possibility of indemnification of ECM by
U.S. Coal, which means that the bankruptcy estate would bear the burden of any
inefficiencies from piecemeal litigation.  The CAM Funds dispute that any
indemnification obligation exists.  The parties submitted only part of the credit agreement
relevant to this issue.  *See* Second Amended and Restated Credit Agreement, dated Aug.
29, 2008 (Decl. of Michael Luskin, Ex. 2) [ECF No. 12].  But a review of the broad
indemnification provisions in Section 8.03(a) and 8.03(b) of the agreement supports the
likelihood of indemnification.[5]  Additionally, ECM represents that U.S. Coal has already

---

[5]        Section 8.03(a)(ii) provides:

> Expenses; Indemnity; Damage Waiver.  (a)  The Borrower shall pay
> . . . (ii) all out-of-pocket expenses incurred by any Lender, including the
> fees, charges and disbursements of any counsel for such Lender (whether
> outside counsel or the allocated costs of its internal legal department), in
> connection with the enforcement, collection or protection of its rights in
> connection with the Loan Documents, including it rights under this
> Section, or in connection with the Loan made hereunder, including all
> such out-of-pocket expenses incurred during any workout, restructuring
> or negotiations in respect of the Loan.

Second Amended and Restated Credit Agreement, at 54-55 (Decl. of Luskin, Ex. 2).
        Section 8.03(b) provides:

paid legal fees and expenses for ECM's counsel from February 2012 to December 2013,

under the indemnification provisions. *See* Hr'g Tr. 37:9-16. ECM further notes that U.S.

Coal has not disputed its indemnification obligations to pay ECM's fees and expenses.

ECM's Opp'n at 15. Thus, it appears that the parties to the relevant credit agreement

believe the indemnification provisions apply. *See id.* [6]

### (B)    The Extent to Which Issues of State Law Predominate

As it is undisputed that issues of state law predominate for the claims in question,

the second factor weighs in favor of the CAM Entities. However, this is a "modest

factor," as bankruptcy judges "address matters of state law on a regular basis." *In re*

*Adelphia Commc'ns. Corp.*, 285 B.R. at 145. ECM correctly observes that "[a]lthough

---

> The Borrower shall indemnify each Lender, the Collateral Agent and each Related Party of each Lender (each such Person being called an "Indemnitee" ) against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities, and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby . . . or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined . . . to have resulted from . . . willful misconduct of such Indemnitee.

Second Amended and Restated Credit Agreement at 55 (Decl. of Luskin, Ex. 2).

[6]    The CAM Entities argue that indemnification for tortious interference is barred by the terms of the credit agreement and New York state law. Reply at 7. The credit agreement provides that "indemnity shall not . . . be available to the extent . . . determined . . . to have resulted from . . . willful misconduct . . . ." Second Amended and Restated Credit Agreement at 56 (Decl. of Luskin, Ex. 2); *see Swan Consultants, Inc. v. Travelers Prop. Cas. Co.*, 360 F. Supp. 2d 582, 591 (S.D.N.Y. 2005) ("New York's public policy, while allowing for indemnification for accidental consequences of intentional acts, clearly prohibits indemnification for intentionally caused injuries.") (citing *Public Serv. Mut. Ins. Co. v. Goldfarb*, 53 N.Y. 2d 392, 399 (1981)). But this argument assumes the CAM Funds will prove their case against ECM for tortious interference. Given that the merits of the tortious interference claim have not been adjudicated, it is too soon to definitively determine the extent of any indemnification obligation.

the CAM Funds' claims against ECM arise under state law, this suit does not raise specialized areas of the law that are not regularly addressed in the federal courts, and there is no material difference in the ability of the state and federal courts to decide these issues." ECM's Opp'n at 20 (citing *In re Adelphia Commc'ns. Corp.*, 285 B.R. at 146). In *Adelphia*, the court found no material difference in the ability of the state and federal courts to decide issues of contract law, in contrast to "matters involving family law, probate law, condemnation law, [and] other specialized areas of law not regularly addressed in the federal courts." *In re Adelphia Commc'ns. Corp.*, 285 B.R. at 146. The contract and tort claims at issue here are the type routinely addressed by federal courts. *See id*.

The CAM Entities urge a greater weight for this factor, arguing that "[c]ourts have consistently found that where solely state law claims are in dispute, the proper forum for such disputes is state court." CAM Entities' Mem. of Law at 13-14 [ECF No. 4] (citing *Shiboleth v. Yerushalmi*, 412 B.R. 113, 118 (S.D.N.Y. 2009); *Digital Satellite Lenders, LLC, v. Ferchill*, 2004 WL 1794502, at *6 (S.D.N.Y. Aug. 10, 2004)). But the cases cited by the CAM Entities do not support the proposition that remand must always occur where state law claims are in dispute. Rather, the decisions in those cases were driven by their facts, and, in fact, pay heed to the same interest of efficiency that drives the result here.

In *Shiboleth*, for example, the district court addressed which forum was most appropriate for a ten-year-old state law action for a partnership accounting as between the bankruptcy court where the defendants' Chapter 7 case was proceeding, and the state court, where there was a special referee who already had extensive experience with the

matter. *Shiboleth*, 412 B.R. at 115-16. The special referee held hearings "that spanned over two and a half years and involved a voluminous record and many witnesses." *Id*. at 118 (citation omitted). The referee also issued a decision in the matter, which was affirmed in part on appeal and otherwise remanded specifically to the special referee for the recalculation of certain contested fees. *Id*. at 116. Shortly thereafter, the case was removed to federal court. *Id*. The court in *Shiboleth* found that the referee's "familiarity with the case and his prior evaluation of witness credibility" had "established the groundwork" for dealing with the case. *Id*. at 118. The court also found it noteworthy that the state appellate court recognized the value of the special referee's knowledge by remanding the case specifically to him, rather than remanding generally to the lower state court. *Id*. at 118. Thus, the *Shiboleth* court not only considered whether issues of state law predominated, but also the obvious efficiencies in remanding the case, efficiencies that are not present here. *Id*. at 117.

Similarly, the *Digital Satellite Lenders* case does not stand for the proposition that remand is required when state law issues predominate. *Digital Satellite Lenders*, 2004 WL 1794502, at *7. In that case, the court instead balanced multiple factors, concluding that "five of the seven factors weigh in favor of remand, including most importantly considerations of efficiency and comity . . . ." *Id*. The court specifically noted that remanding to state court created efficiency because the entire action could "be considered as a whole." *Id*. at 5.

### (C)     The Difficulty or Unsettled Nature of the Applicable State Law

The CAM Entities assert that "the state law regarding tortious interference with contract claims and the economic interest defense asserted by ECM is both difficult and unsettled." Reply at 9. The CAM Entities rely on three sources for this argument: 1) a

Second Circuit case, *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281 (2d

Cir. 2006) (certifying a question to the New York Court of Appeals), *certified question*

*accepted*, 7 N.Y.3d 830 (2006), *certified question answered*, 8 N.Y.3d 422 (2007); 2) a

February 2013 article from the New York Law Journal; and 3) the Restatement Second of

Torts.  But none of these sources establish that the applicable state law is difficult or

remains unsettled.

In the *White Plains Coat* case, the Second Circuit certified the following question

to the New York Court of Appeals: "Does a generalized economic interest in soliciting

business for profit constitute a defense to a claim of tortious interference with an existing

contract for an alleged tortfeasor with no previous economic relationship with the

breaching party?"  *White Plains Coat*, 460 F.3d at 288-89.  The New York Court of

Appeals found that it did not.[7]  *White Plains Coat*, 8 N.Y.3d at 425.  In so ruling, the

New York Court of Appeals provided guidance for applying the "economic interest"

defense.  It held that "[a]t bottom, as a matter of policy, courts are called upon to strike a

balance between two valued interests: protection of enforceable contracts, which lends

stability and predictability to parties' dealings, and promotion of free and robust

competition in the marketplace."  *Id*.  The Court of Appeals provided specific examples

of legal or financial interests in the breaching party's business that would be sufficient to

trigger the economic interest defense, including: i) where the defendants were significant

stockholders in the breaching party's business; ii) where defendant and breaching party

---

[7]        In *White Plains Coat*, plaintiff White Plains Coat & Apron Co., Inc. rented napkins and laundered
articles to restaurants and other businesses.  *White Plains Coat*, 460 F.3d at 282.  Its rental contracts with its
customers included a five-year exclusive service provider provision.  *Id*.  Another company, Cintas,
allegedly improperly solicited some of White Plains Coat's exclusive customers and began renting napkins
and laundered articles to them.  *Id*. at 283.  White Plains Coat sued Cintas for tortious interference with its
existing exclusive customer contracts.  *Id*.

had a parent-subsidiary relationship; iii) where defendant was the breaching party's creditor; and iv) where defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff. *See id*. at 426. Applying all these principles, the Court of Appeals concluded that the economic interest defense did not apply in that case because the defendant had no preexisting legal or financial interest in the plaintiff's customers, but was simply a competitor trying to get new business. *Id*.

The New York Court of Appeal's decision in *White Plains Coat* has been cited extensively in the seven years since it was issued. Nothing about *White Plains Coat* indicates that, legally, the economic interest defense is confused or materially more difficult to apply in this dispute than other laws.[8] The CAM Entities also have not established why that decision—and its progeny— would not provide sufficient guidance on the economic interest defense. *See* Hr'g Tr. 70:4-72:23.

The Court reaches the same conclusion as to the New York Law Journal article relied up by the CAM Entities, entitled "The Economic Interest Defense to Tortious Interference Claims." George Bundy Smith & Thomas J. Hall, *The Economic Interest Defense to Tortious Interference Claims*, 249 N.Y.L.J. 31 (Feb. 15, 2013). Nothing in the article suggests the law is unsettled or unusually difficult to apply. *Id*. Written in 2013 and referring to the 2006 opinion in *White Plains Coat*, the authors considered the 2006 opinion "recent," taking a long-term view of case law. Even more telling is the subtitle

---

[8]    Unlike in *White Plains Coat*, the case here possesses several characteristics identified by the New York Court of Appeals. *See White Plains Coat*, 8 N.Y.3d at 426. Defendant ECM is both a significant creditor and a significant equity holder. CAM Entities' Mem. of Law at 4-7. ECM was formed in September 2009 and promptly acquired $24 million of U.S. Coal's debt and $3 million in equity. *Id*. at 7. It also obtained security interests in JAD Coal's property. *Id*.

of the article, "Court of Appeals Clarifies," referring to the guidance provided by the

Court of Appeals in the *White Plains Coat* decision.  In the same vein, the article

concludes that a number of New York Commercial Division cases "plainly demonstrate

the requirement in tortious interference with contract cases that defendants show they

were acting to protect their interest in the breaching party, rather than their own [direct]

self-interest." *Id.*

Finally, the Court rejects the CAM Entities' reliance on the Restatement (Second)

of Torts.  At oral argument, counsel for the CAM Entities stated:

> But more recently, actually . . . there's a[n] article from
> George Bundy Smith . . .  from February 15, 2013, which
> stated "the law in this area has not fully congealed but is still
> in its formative stage."  And the title of that article was the
> Economic Interest Defense to Tortious Interference Claims."

Hr'g Tr. 8:8-17.  The cited article does not contain the language cited by the CAM

Entities, which is actually found in the introductory note to Chapter 37 of the

Restatement (Second) of Torts.  *See* RESTATEMENT (SECOND) OF TORTS: ON THE BASIS OF

LIABILITY FOR INTERFERENCE WITH EXISTING OR PROSPECTIVE CONTRACTUAL RELATIONS

AND THE TERMINOLOGY USED IN THIS CHAPTER ch. 37, intro. note (1979).  The

Restatement note, however, was written in 1979.  It does not establish that the economic

interest defense is unsettled or difficult some 35 years later.

Given a review of these three sources then, the Court concludes that the CAM

Entities have not shown that the applicable law is difficult or unsettled.

**(D)    Comity**

The facts of the case do not favor remand based on comity.  "Comity focuses on

the state's interest in developing its law and applying its law to its citizens." *In re*

*Adelphia Commc'ns. Corp.*, 285 B.R. at 146 (citing *Renaissance Cosmetics, Inc. v. Dev. Specialists Inc.*, 277 B.R. 5, 16 (S.D.N.Y. 2002)). The Plaintiffs are the CAM Funds, which are "two Cayman Island investment funds." CAM Entities' Mem. of Law at 4. "U.S. Coal is a Delaware corporation that is the parent holding corporation of numerous subsidiary coal companies" including JAD Coal. *Id.* "ECM is a Delaware limited liability company." *Id.* The CAM Entities contend that many of the members of ECM "reside or work in New York," but do not provide any evidence for that assertion. *See id.* at 14.

Comity is also not a material factor where a matter does not involve state public policy or the state's public interest. *See Blackacre Bridge Capital, LLC v. Korff (In re River Ctr. Holdings, LLC)*, 288 B.R. 59, 70 (Bankr. S.D.N.Y. 2003). In *River Center Holdings*, the court identified that "situations [exist] where New York law must be applied by reason of a strong state or local interest in regulating the matter in controversy—as it might, for example, in connection with landlord-tenant matters in the City or State of New York." *Id.* at 70. By contrast, the Court here need only resolve a typical commercial dispute between entities from outside New York. *See Renaissance Cosmetics, Inc.*, 277 B.R. at 16 (finding the fact that no party was a New York citizen neutralized some comity concerns that would favor remand). And while the State of New York may have a somewhat stronger interest in applying its own tortious interference law, that law is not unusually complex or unsettled. *See id.* (combining "the fact that any New York law at issue is not unusually complex or unsettled" with other circumstances to neutralize any comity concerns that would favor remand).

### (E)    Remaining Factors

The balance of the remaining relevant factors weigh against remand.  As this proceeding is related to the bankruptcy case, the fifth factor—the degree of relatedness or remoteness of the proceeding to the main bankruptcy case—weighs against remand.  *See In re River Ctr. Holdings, LLC*, 288 B.R. at 70.  Indeed, the CAM Funds concede that its "claims against ECM are related to the bankruptcy case to the extent that the managers of ECM are also present or former managers of U.S. Coal."  CAM Entities' Mem. of Law at 14.  Some courts considering this factor have looked to whether the bankruptcy case is opened or closed, and whether it is a Chapter 11 or Chapter 7 case.  *See In re Am. Equities*, 460 B.R. at 130-31.  The bankruptcy case here is an open Chapter 11 case, which weighs against remand.  *See id.*

Two other factors weigh strongly against remand: 1) the duplicative and uneconomical use of judicial resources; and 2) the lessened possibility of inconsistent results.  There is significant overlap in the elements for the breach of contract claims and the tortious interference claims.  To prove a breach of contract claim, the CAM Funds must prove four elements: (i) the existence of a valid contract between the CAM Funds and the Debtors; (ii) the CAM Funds' performance of the contract; (iii) the Debtors' breach of the contract; and (iv) the CAM Funds' resulting damages from that breach. *Harris v. Seward Park Hous. Corp.*, 79 A.D.3d 425, 426 (N.Y. App. Div. 1st Dep't 2010).[9]  To prove tortious interference with contract, the CAM Funds must establish five elements: (i) the existence of a valid contract between the CAM Funds and the Debtors;

---

[9]      ECM's papers set forth, and the CAM Entities do not challenge, the elements of a breach of contract claim and a tortious interference with contract claim under New York state law.  ECM's Opp'n at 11.

(ii) ECM's knowledge of that contract; (iii) ECM's intentional procurement of the

Debtors' breach of contract without justification; (iv) the Debtors' breach of contract; and

(v) the CAM Funds' resulting damages. *Vigoda v. DCA Prods. Plus Inc.*, 293 A.D.2d

265, 266 (N.Y. App. Div. 1st Dep't 2002) (internal citation omitted). Comparing the

elements of these two causes of action, both require proving three of the same elements:

1) the existence of a valid contract; 2) the breach of that contract; and 3) resulting

damages.

Given these overlapping elements, the evidence on claims four through six will

clearly overlap with the evidence on claims one through three. If the CAM Funds' claims

against ECM were remanded, therefore, duplicative litigation in the New York State

Court and the bankruptcy court in Kentucky would lead to an uneconomical use of

judicial resources. With respect to discovery, "there is no good reason . . . to bifurcate

that discovery, or to necessitate federal-state coordination of ongoing discovery needs in

two separate courts." *See In re Adelphia Commc'ns. Corp.*, 285 B.R. at 145.

In addition, remanding the CAM Funds' claims could lead to a New York State

Court and a Kentucky federal court rendering inconsistent judgments. All these concerns

weigh against remand. *See Nemsa*, 1995 WL 489711, at *7-9 ("To remand the case

would result in a duplication of effort and multiplicity of litigation because of the

strongly intertwined relationship between the [non-debtor defendants and the debtor

defendant].").

Regarding the final factor, the Court finds that the CAM Entities fail to articulate

prejudice that favors remand. They fail to explain how their claims against ECM would

be "reset" when transferred to Kentucky or how the use of time and resources favors

remand.  As the breach of contract claims against the Debtors will proceed in the

Kentucky bankruptcy court, there is no efficiency to be gained by remand of the

remaining claims to the New York State Court.  *See* Hr'g Tr. 38:8-25 (Mr. Luskin,

counsel for ECM, explaining the same). [10]

## **CONCLUSION**

For all the reasons stated above, the Court concludes that the CAM Funds' claims

against ECM should not be remanded to the New York State Court and denies the CAM

Entities' motion to remand.

Dated:  New York, New York
        March 17, 2015


                    */s/ Sean H. Lane*
                    UNITED STATES BANKRUPTCY JUDGE

---

[10]    The CAM Entities raise the existence of the right to a jury trial as a separate factor in the equitable remand analysis.  But as this issue was previously addressed when discussing the effect on the administration of the bankruptcy case, the Court will not discuss it separately here.